# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

BP EXPLORATION & PRODUCTION COMPANY
INC.,
BP AMERICA INC.,
BP CORPORATION NORTH AMERICA INC.,
BP AMERICA PRODUCTION COMPANY,
BP PRODUCTS NORTH AMERICA INC., d/b/a BP
MARINE AMERICAS and CASTROL MARINE
AMERICAS,
BP p.l.c.,
BP OIL INTERNATIONAL LIMITED,
AIR BP LIMITED, BP MARINE LIMITED,
BP WEST COAST PRODUCTS LLC,
BP SINGAPORE PTE. LIMITED,
BP AUSTRALIA PTY LIMITED,
BP GLOBAL INVESTMENTS SALALAH & CO. LLC,
BP ENERGY CO.,
ATLANTIC RICHFIELD COMPANY,
BP AMOCO CHEMICAL COMPANY,
BP COMPANY NORTH AMERICA INC.,
BP EXPLORATION (ALASKA) INC.,
THE STANDARD OIL COMPANY,
BP INTERNATIONAL LIMITED, and
IGI RESOURCES INC.,

        *Plaintiffs,*

    v.

GINA McCARTHY, in her official capacity as
Administrator of the United States  Environmental
Protection Agency,

RICHARD A. PELLETIER, in his official capacity as the
Suspension and Debarment Official of the United States
Environmental Protection Agency, and

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,

        *Defendants.*

Case No. 4:13-cv-2349

Section __

Honorable _____

Magistrate Judge _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs BP Exploration & Production Company Inc., BP America, Inc., BP Corporation North America Inc., BP America Production Company, BP Products North America Inc., BP p.l.c., BP Oil International Limited, Air BP Limited, BP Marine Limited, BP West Coast Products LLC, BP Singapore Pte. Limited, BP Australia Pty Limited, BP Global Investments Salalah & Co. LLC, BP Energy Co., Atlantic Richfield Company, BP Amoco Chemical Company, BP Company North America Inc., BP Exploration (Alaska) Inc., The Standard Oil Company, BP International Limited, and IGI Resources Inc. (collectively, "BP" or "Plaintiffs") hereby file their Complaint for declaratory judgment and preliminary and permanent injunctive relief against Defendants Gina McCarthy, in her official capacity as Administrator of the United States Environmental Protection Agency, Richard A. Pelletier, in his official capacity as the Suspension and Debarment Official of the United States Environmental Protection Agency, and the United States Environmental Protection Agency ("EPA").

In support thereof, BP states as follows:

## I.      NATURE OF THE ACTION

1.      BP brings this action challenging EPA's November 28, 2012 and January 4, 2013 suspensions of Plaintiffs from participating in any new federal procurement contracts and nonprocurement covered transactions, and EPA's separate February 1, 2013 disqualification of BP Exploration & Production Company Inc. ("BPXP") under the Clean Water Act from receiving any new federal contracts or other benefits.  EPA issued its written Memorandum of Decision continuing the suspensions and disqualification on July 19, 2013.

2.      With the exception of BP p.l.c., BP has a long-standing business relationship with the federal government.  As one of the country's largest corporate employers and investors, BP is

the leading producer of deepwater oil and gas in the Gulf of Mexico under federal drilling leases, and is one of the government's largest fuel suppliers here and abroad.

3.     For more than two and a half years after the *Deepwater Horizon* accident on April 20, 2010, the federal government continued to purchase fuel under contracts with BP, and as required by law, repeatedly determined that BP was a responsible government contractor before each award.  Similarly, BP's principal federal regulators publicly expressed their confidence in BP as a safe and responsible operator, allowing it to bid on and win dozens of lease blocks in the Gulf of Mexico and issuing drilling licenses and permits.  In order to maintain its eligibility to continue participating in federal contracts and transactions, BP initiated discussions with EPA in July 2012 for the purpose of resolving any potential federal suspension and debarment issues as a result of the *Deepwater Horizon* incident.

4.     EPA and BP spent months negotiating the substance and terms of an Administrative Agreement to resolve any such issues when, in the midst of those negotiations, EPA suspended BP on November 28, 2012 and January 4, 2013, without any prior notice. EPA's suspension includes 21 different BP entities, nearly all of which had no involvement in the accident or its aftermath.  EPA's decision to suspend did not address the overwhelming evidence and record of BP's present responsibility as a government contractor and leaseholder, and did not attempt to explain how or why immediate suspension was necessary to protect the public interest, as federal law requires.  No such explanation is possible given that (a) the government continued to contract with BP, award it new leases, and determine that BP is a responsible contractor long after the *Deepwater Horizon* incident; (b) the events and conduct alleged by EPA to be the basis for suspension had been known to that agency for months or even

years; and (c) the government properly continues to do business with BP under existing contracts and leases awarded prior to the suspension.

5.      EPA compounded its errors on February 1, 2013, when it disqualified Plaintiff BPXP from all federal contracts and benefits based on BPXP's one-count misdemeanor conviction for violating the Clean Water Act.  In so doing, EPA designated BPXP's corporate headquarters in Houston as the place where the Clean Water Act violation giving rise to BPXP's conviction occurred.  But there was no Clean Water Act violation at BPXP's headquarters and BPXP has never been convicted of such a violation.  Instead, BPXP pleaded guilty to, and was convicted of, negligently discharging oil into the Gulf of Mexico when the Macondo well blew out on April 20, 2010.  Simply stated, BPXP's Clean Water violation did not occur in Houston; it occurred more than 440 miles away in the Gulf of Mexico.

6.      BP challenged EPA's suspension and disqualification decisions administratively, but EPA denied BP's challenge on July 19, 2013.  Given EPA's final agency action in this matter, immediate judicial review of EPA's decisions under the Administrative Procedure Act is essential and warranted.

7.      EPA's suspension of the BP Plaintiffs and separate disqualification of BPXP are contrary to federal law and regulations; exceed EPA's statutory and regulatory authority and limitations; are unsupported and contradicted by the record in this matter; and are punitive, arbitrary, capricious, and an abuse of EPA's discretion, all of which violate the Administrative Procedure Act.  EPA wields extraordinary power in making suspension and disqualification decisions and must scrupulously follow the law and legal standards that govern its actions.  It has manifestly failed to do so in this matter.  This Court should declare the suspension and disqualification null, void, and unenforceable, and enjoin EPA from enforcing them.

## II.    PARTIES

**A.    Plaintiffs**

8.    BP Exploration & Production Inc. ("BPXP") is a Delaware corporation with its principal place of business in Houston, Texas.

9.    BP America Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

10.    BP Corporation North America Inc. is an Indiana corporation with its principal place of business in Houston, Texas.

11.    BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas.

12.    BP Products North America Inc., d/b/a BP Marine Americas and Castrol Marine Americas, is a Maryland corporation with its principal place of business in Naperville, Illinois.

13.    BP p.l.c. is organized under the laws of England and Wales with its principal place of business in London, United Kingdom.

14.    BP Oil International Limited is organized under the laws of England and Wales with its principal place of business in London, United Kingdom.

15.    Air BP Limited is organized under the laws of England and Wales with its principal place of business in Hemel Hempstead, United Kingdom.

16.    BP Marine Limited is organized under the laws of England and Wales with its principal place of business in Pangbourne, United Kingdom.

17.    BP West Coast Products LLC is a Delaware limited liability company with its principal place of business in La Palma, California.

18.     BP Singapore Pte. Limited is incorporated in Singapore with its principal place of business in Singapore.

19.     BP Australia Pty Limited is incorporated in Victoria, Australia, with its principal place of business in Docklands, Victoria, Australia.

20.     BP Global Investments Salalah & Co. LLC is incorporated in Oman with its principal place of business in Raysut Salalah, Oman.

21.     BP Energy Company is a Delaware corporation with its principal place of business in Houston, Texas.

22.     Atlantic Richfield Company is a Delaware corporation with its principal place of business in Houston, Texas.

23.     BP Amoco Chemical Company is a Delaware corporation with its principal place of business in Naperville, Illinois.

24.     BP Company North America Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

25.     BP Exploration (Alaska) Inc. is a Delaware corporation with its principal place of business in Anchorage, Alaska.

26.     The Standard Oil Company is an Ohio corporation with its principal place of business in Houston, Texas.

27.     BP International Limited is organized under the laws of England and Wales with its principal place of business in London, United Kingdom.

28.     IGI Resources Inc. is an Idaho corporation with its principal place of business in Houston, Texas.

**B.      Defendants**

29.      Gina McCarthy is the Administrator of EPA and is sued in her official capacity. The allegations set forth herein as to Defendant McCarthy and her agency are not limited to her individually, but also extend to and include the employees, officers, agents, consultants, and other personnel or units in the appropriate department of EPA working under her direction.

30.      Richard A. Pelletier is the EPA Suspension and Debarment Official and is sued in his official capacity as the official responsible for making the decisions to suspend BP and disqualify BPXP.  The allegations set forth herein as to Defendant Pelletier and his department are not limited to him individually, but also extend to and include the employees, officers, agents, consultants, and other personnel or units in the appropriate department of EPA working under his direction.

31.      EPA is an agency within the Executive Branch of the United States government. The allegations set forth herein as to Defendant EPA extend to and include the employees, officers, agents, consultants, and other personnel or units in the appropriate department of EPA with connection to the facts alleged herein.

### III.      JURISDICTION AND VENUE

32.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  This action to determine the lawfulness of EPA's decisions to suspend BP and to disqualify BPXP arises under the Administrative Procedure Act, 5 U.S.C. §§ 555, 702, and 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

33.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claims herein occurred within this judicial district and/or a

substantial part of property that is the subject of this action is situated in this judicial district. Many of the Plaintiffs reside in and/or have the most significant contacts in this district.

## IV.   STATEMENT OF FACTS

**A.   BP's Long-Standing Relationship With The Federal Government**

34.     With the exception of BP p.l.c., BP has been a long-standing business partner of the federal government.  BP has more that 20,000 employees in the United States and invests heavily in our economy and labor force.  Between 2007 and July 2012, BP supplied more than $52 billion towards energy development in America — $20 billion more than its nearest competitor.

### 1.     BP's fuel and natural gas contracts with the government

35.     Through its various operating entities, BP is one of the largest fuel suppliers to the government.  BP holds contracts with the United States worth more than $1.34 billion, under which the company provides jet fuel, marine diesel fuel, aviation gasoline, commercial airport refueling services, bulk fuel storage, lubricants, and natural gas.  Most of these contracts support our national defense and are issued or administered by the Defense Logistics Agency ("DLA") and Defense Logistics Agency Energy ("DLAE") within the United States Department of Defense.  These contracts were awarded to several of the Plaintiffs, including BP Products North America Inc., BP West Coast Products LLC, Air BP Limited, BP Energy Company, and IGI Resources Inc.

36.     As of July 2012, BP's domestic federal contracts included an award to BP West Coast Products LLC with a projected value of nearly $781,824,000 for the provision of jet fuel to DLAE, and awards to BP Products North America Inc. for fuel and marine lubricants with a projected value of nearly $240 million.

37.     BP also is a major provider of supplies and services in support of the federal government's efforts abroad.  Among other things, BP has federal contracts in excess of $180 million to provide commercial airport refueling services, aviation gasoline, and fuel storage services to critical United States operations overseas.  The total value of BP's international contracts with the United States government exceeds $224 million.

### 2.     BP's lease transactions with the government

38.     Through BPXP, BP holds the most federal deepwater lease acreage in the Gulf of Mexico and is one of the industry's leading producers of oil and gas from this area.  BPXP's production from the Gulf of Mexico amounted to 261,000 barrels of oil equivalent per day in 2011 and 214,000 barrels of oil equivalent per day in 2012.  BPXP currently holds interests in 719 leases in the Gulf of Mexico, nearly all of them in deepwater.

## B.     The Federal Government Continued Doing Business With BP Following The *Deepwater Horizon* Accident

39.     The *Deepwater Horizon* accident occurred on April 20, 2010, when the Macondo well located within Mississippi Canyon Block 252 in the Gulf of Mexico blew out.  The blowout was a multiparty, multi-causal event that resulted in explosions and a large fire on the *Deepwater Horizon* rig, a tragic loss of life, and oil flowing into the Gulf of Mexico until the Macondo well was capped on July 15, 2010.

40.     BP immediately accepted responsibility for its role in the accident and promptly implemented numerous remedial and corrective measures to improve its operations and prevent a similar occurrence.  As a result, the federal government continued to do business with BP.

41.     Specifically, the federal government awarded 23 fuel contracts to BP following the *Deepwater Horizon* accident.  Before awarding each such contract, contracting officers for the federal government determined that BP is a responsible contractor, including that it has a

9

satisfactory performance record and a satisfactory record of integrity and business ethics.  *See* 48 C.F.R. § 9.104-1(c)-(d).  The government has thus repeatedly concluded over the past three years that BP is responsible and, indeed, continues to purchase fuel from BP under the parties' existing contracts.

42.     Since 2010, BP has received 84 licenses for drilling in twelve countries, including 55 licenses in 2011 alone.  In December 2011, BPXP won bids for, and was subsequently awarded, 11 U.S. deepwater blocks in the Gulf of Mexico in a Department of Interior ("DOI") lease sale.  BPXP won, and was subsequently awarded, another 43 U.S. deepwater blocks in the Gulf of Mexico in a June 2012 lease sale — the second highest number of blocks among all bidders.  In awarding each of these leases and blocks, DOI on behalf of the federal government deemed BPXP to be responsible and qualified for purposes of new drilling activities.  *See* 30 C.F.R. § 556.35(a).  BPXP continues to operate and do business in the Gulf of Mexico under these existing DOI leases.

43.     Federal officials, including those in charge of oil and gas operations in the Gulf of Mexico, have publicly and repeatedly stated that BP is a safe operator.  For example, in October 2011, nearly 18 months after the *Deepwater Horizon* accident, Michael Bromwich, then Director of DOI's Bureau of Safety and Environmental Enforcement ("BSEE") — one of BP's principal regulators relating to deepwater drilling — noted BP's strong safety record:

> We've done analyses over time on the relative safety records of offshore operators and they [BP] were in close to the top crew.
>
> The question is, do you administer the administrative death penalty based on one incident?  …  And we've concluded, I've concluded, that's not appropriate in these circumstances.

(Exhibit A, Olga Belogolova, *BP Awarded $27 Million in Leases for Gulf Oil, Gas Exploration*, NATIONAL JOURNAL, Dec. 14, 2011).

44.    Similarly, in approving a deepwater drilling permit for BP in October 2011, following BSEE's implementation of enhanced safety requirements and standards for deepwater drilling, Director Bromwich noted that:

> BP has met all of the enhanced safety requirements that we have implemented and applied consistently over the past year.   In addition, BP has adhered to voluntary standards that go beyond the agency's regulatory requirements.  …  This permit was approved only after thorough well design, blowout preventer, and containment capability reviews.

(Exhibit B, Bureau of Safety and Environmental Enforcement, *BSEE Approves First BP Drilling Permit to Meet Enhanced Regulations*).

45.    William Reilly, Co-Chairman of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling — and a former EPA Administrator — found that:

> BP itself has made very significant progress.  They're the first company to require double-shear rams for the blowout preventers, and what I hear from people who are working with them in the field, that is joint venture partners and others, is they are scrupulous about applying new rigorous standards of oversight for process safety.
>
> …
>
> I believe BP is a transforming culture.  …  The kinds of things that they are paying attention to, the degree of concern when they accept a rig, for example, it's zero defects.  Historically they would work things out in the course of operating if there were some problems with a rig in a deepwater situation.  Not anymore.  Not on the part of BP.  …  I think it's a company that learned its lesson — I mean it should have, it had a $100 billion market cap destruction  and undetermined yet total costs as a result of fines and penalties — but yes I think they deserve a lot of credit.

(PLATTS ENERGY WEEK, Videotaped Interview of William Reilly, Part 1 (April 22, 2012), available  at  http://www.plattsenergyweektv.com/news/article/203156/293/042212-William-Reilly-Interview-Part-1-; Exhibit C, Andrew Restuccia, *Oil Spill Commission Chief: BP Has 'Learned Its Lesson' in the Gulf*, THE HILL (April 22, 2012)).

C.     **BP's Present Responsibility Submission And Attempts To Reach An Administrative Agreement With EPA**

46.     Although the federal government had continued to issue new contracts and award new leases to BP in the years following the *Deepwater Horizon* accident, BP nonetheless sought to demonstrate to the government that BP is a presently responsible contractor and should remain eligible to receive new federal procurement contracts and to participate in nonprocurement covered transactions, such as leaseholds for deepwater drilling.

47.     In this regard, BP recognized that in spite of the government's numerous determinations that BP is a responsible contractor, Defendant Pelletier, EPA's Suspension and Debarment Official ("SDO"), might not be aware of these findings or of the numerous remedial measures implemented by BP following the accident.  Accordingly, beginning in July 2012, BP brought the matter to EPA's SDO and initiated discussions regarding BP's present responsibility as a government contractor.

48.     On July 6, 2012, at BP's request, representatives of BP and EPA met in Washington D.C.  BP provided EPA with an overview of BP's corrective and remedial activities since the *Deepwater Horizon* incident.  BP also proposed to provide EPA with a "Present Responsibility Submission" describing the corrective and remedial actions that BP has taken since the accident, which would demonstrate BP's present responsibility to continue as a government contractor.

49.     On July 16, 2012, BP provided to Defendants EPA and Pelletier a voluminous Present Responsibility Submission.  The Present Responsibility Submission addressed:

- The *Deepwater Horizon* accident and BP's immediate response to it;

- The results of BP's internal investigation about the causes of the accident;

- The numerous measures BP has taken to prevent a similar occurrence;

- BP's cooperation with the various government investigations relating to the incident;

- BP's extensive remediation and restitution efforts;

- The enhancements to BP's ethics, compliance, safety, operational integrity, and risk management programs made after the accident;

- The improvements to safety of BP's offshore operations; and

- BP's adoption of voluntary drilling standards that exceed what the federal government itself requires.

50.     EPA has never disputed the existence of any of the corrective and remedial measures described in BP's Present Responsibility Submission.

51.     During the July 16, 2012 meeting, BP provided EPA with the current status of BP's communications with the United States government regarding possible settlement of matters related to the *Deepwater Horizon* incident.  BP also informed EPA that BP wanted to keep the suspension and debarment officials of other interested federal agencies with whom BP does business, including DOI and DLA, apprised of the parties' discussions and BP's efforts to demonstrate its present responsibility.  The Director of EPA's Suspension and Debarment Division ("SDD") instructed BP to provide its Present Responsibility Submission to the SDD and stated that EPA, as the lead agency for federal suspension and debarment actions arising from the *Deepwater Horizon* incident, would keep other interested agencies apprised of developments.

52.     BP and EPA met again in Washington, D.C., on July 23, 2012.   BP's representatives delivered a presentation summarizing BP's Present Responsibility Submission, answered questions from EPA's SDD, and discussed with EPA the possibility of obtaining an Administrative Agreement, if needed, to resolve any issues relating to suspension or debarment. EPA's SDD requested a written response to certain questions relating to BP's presentation,

which BP provided in a letter dated September 12, 2012.  BP also provided EPA with a status update regarding BP's communications with the United States government regarding the possible settlement of matters related to the *Deepwater Horizon* incident.

53.     On October 2, 2012, BP and EPA conducted a telephone conference in which EPA's SDD discussed BP's Ethics and Compliance programs with BP's Corporate Ethics and Compliance Officer.  The Corporate Ethics and Compliance Officer answered SDD's questions regarding various of the topics addressed in BP's Present Responsibility Submission.  Later that afternoon, EPA sent to BP the agency's initial draft of certain terms for an Administrative Agreement.

54.     On October 3, 2012, BP and EPA held a meeting at which BP provided EPA with the current status of BP's settlement communications with the United States government and the parties discussed certain aspects of an Administrative Agreement.  EPA was made aware, for example, that BPXP was attempting to negotiate the terms of a criminal plea and civil settlement with the Department of Justice and the Securities and Exchange Commission, and EPA was apprised of the likely types of charges BPXP faced.  EPA's SDD informed BP during the meeting that the SDD was in the process of drafting additional terms for the Administrative Agreement and expected to provide them in approximately one week.

55.     BP and EPA met again in Washington, D.C. on October 5, 2012 to discuss the status of BP's settlement communications with the government as well as the potential contents of the Administrative Agreement.  At this meeting, BP provided EPA's SDD with BP's draft of certain Administrative Agreement terms and other documents, including contact information for BP's counsel and representatives who would be available to answer any questions from SDD's counsel.

56.     BP and EPA held a telephone conference on October 8, 2012 to discuss certain substantive terms for the Administrative Agreement, and then met in person on October 11, 2012 in Washington, D.C. to discuss the parties' ongoing work toward an agreement, including specific contractual terms.

57.     On October 12, 2012, EPA sent BP two sets of questions seeking additional information about matters addressed in BP's Present Responsibility Submission.  BP provided prompt written responses to EPA's questions on October 24, 2012 and October 31, 2012.

58.     The parties continued to correspond regarding an Administrative Agreement.  On November 16, 2012, EPA's SDD informed BP that EPA would obtain input from other interested agencies and then move forward with BP on such an agreement.

59.     BP did not receive anything further from EPA regarding the draft Administrative Agreement.  Instead, on November 28, 2012, EPA suspended BP without any prior notice.

**D.      BPXP's Criminal Case and Plea Agreement**

60.     On November 15, 2012, the United States government filed a criminal Information against Defendant BPXP.  That same day, BPXP entered into a Plea Agreement with the Department of Justice.

61.     Under the Plea Agreement, BPXP — and BPXP alone — agreed to plead guilty to eleven counts of violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers); one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress); one misdemeanor count of a violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act); and one misdemeanor count of a violation of 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), all arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.  (11/15/2012 Guilty Plea Agreement, Case 2:12-cr-00292-SSV-DEK, Rec. Doc. 2-1, ¶ 1).  The allocution set forth in

Exhibit A to the Plea Agreement, to which BPXP agreed, provides the factual basis for its conviction on these counts.  (*Id.* ¶ 1 & Exhibit A thereto).

62.     In the Plea Agreement, BPXP agreed to, among other things, a sentence including the payment of $4 billion in total recoveries, consisting of $1.256 billion in fines, payments of $2.394 billion to the National Fish and Wildlife Foundation to remedy harm and eliminate or reduce the risk of future harm to the natural resources of the Gulf Coast and the State of Louisiana, and payments of $350 million to the National Academy of Sciences for the purposes of research into oil spill prevention and response in the Gulf of Mexico.  (*Id.* ¶ 4 & Exhibit B thereto at ¶¶ 34-37).

63.     The United States agreed in the Plea Agreement, among other things, that it would not further prosecute BPXP, BP p.l.c. or "any other BP plc entity" (defined as including, but not limited to, any former, present or future parent, affiliate, division, and subsidiary of BP p.l.c.), and all of their predecessors, successors and assigns, for any conduct regarding any matters under investigation by the *Deepwater Horizon* Task Force relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.  (*Id*. at ¶¶ 2, 7).

64.     The Justice Department also specifically agreed on behalf of the United States that, if requested to do so, it would advise any appropriate suspension or debarment authority that, in the Department's view, BPXP has accepted criminal responsibility for its conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response by virtue of the guilty plea, and that BP is obligated pursuant to the Plea Agreement to cooperate in any ongoing criminal investigation by the Justice Department relating to the incident.  (*Id*. at ¶ 8).

65.     The Plea Agreement included a proposed order containing a detailed series of remedial safety and ethics-related measures BP would take in connection with the plea (the "Remedial Order").  These measures include the following:

- BPXP's retention of a Process Safety Monitor and an Ethics Monitor;

- Safety and Environmental Management Systems Audits relating to deepwater drilling rigs, rig contractors, and BPXP-operated platforms;

- Operational enhancements, including third party verification of maintenance on blowout preventers used by BPXP or its contractors, deepwater well control competency assessments, cement design and competency requirements, BPXP's maintenance of a real-time drilling operations monitoring center, and incident reporting requirements;

- Oil Spill Response Training and Drills, including the use of third party training and participation by the United States Coast Guard and BSEE;

- Incorporation of best practices concerning BPXP's Oil Spill Response Plan, development of safety technology in collaboration with industry and academic efforts, and the development and implementation of safety technology pilot projects in coordination with BSEE;

- Transparency in the form of a public website to be created by BPXP for informational and reporting purposes;

- Rig equipment requirements, including the use of subsea blowout preventers equipped with at least two blind shear rams and a casing shear ram on all drilling rigs under contract to BPXP for deepwater drilling operations in dynamic positioning mode;

- BPXP's maintenance of a Safety Organization with authority to intervene or stop any operation that it deems unsafe; and

- A third-party auditor to review and report to the Department of Justice, Probation Officer, and BPXP regarding BPXP's compliance with certain terms of the Remedial Order.  (*Id*. ¶ 4(c)(viii) & Exhibit B thereto at ¶¶ 1-31).

66.     Under the Remedial Order, BPXP was required to develop and submit for approval by the Department of Justice and the Probation Officer a detailed Implementation Plan for each of these measures.  (*Id*. Exhibit B thereto at ¶ 32).

67.     On January 29, 2013, the United States District Court for the Eastern District of Louisiana accepted BPXP's Plea Agreement, imposed sentence, approved and entered the Remedial Order, and entered judgment.  The Court issued written Reasons for Accepting Plea Agreement the next day, which it amended on February 8, 2013.  BPXP's criminal proceedings are concluded.

68.     BPXP timely prepared and submitted the Implementation Plan required by the Remedial Order.  The Implementation Plan was approved by the Justice Department and Probation Officer following thorough review by an inter-agency government working committee that included representatives of the Justice Department, BSEE, and EPA.   BPXP's Implementation Plan became effective as of April 19, 2013.

69.     BPXP is performing the terms of the Plea Agreement, Remedial Order, and Implementation Plan, including the selection of an Ethics Monitor approved by the Justice Department.

**E.     EPA Suspended Plaintiffs Without Any Prior Notice**

70.     On November 28, 2012, more than two and a half years after the *Deepwater Horizon* incident, and several months into the parties' negotiations concerning an Administrative Agreement, Defendant Pelletier issued a Notice of Suspension to all of the BP Plaintiffs except Plaintiff Castrol Marine Americas, without any prior notice.  (Exhibit D-1, 11/28/2012 Notice of Suspensions).  The November 28 Suspension Notice is based upon a November 23 Revised Action Referral Memorandum from EPA's SDD Debarment Counsel to Defendant Pelletier.  (*Id.* at 2; Exhibit D-2, 11/23/2012 Revised Action Referral Memorandum).

71.     On January 4, 2013, Defendant Pelletier issued a Notice of Suspension to Plaintiff Castrol Marine Americas, without any prior notice.   (Exhibit E-1, 1/4/2013 Notice of

Suspension).  The January 4 Suspension Notice is based upon a Supplemental Action Referral Memorandum of the same date from EPA's SDD Debarment Counsel to Defendant Pelletier. (*Id.* at 1; Exhibit E-2, 1/4/2013 Supplemental Action Referral Memorandum).  The November 28 and January 4 Notices of Suspension are collectively referred to herein as the "Suspension Notice."

72.     EPA's Suspension Notice immediately suspended each of the Plaintiffs "from participating in federal contracts and other covered transactions," rendering them "ineligible to receive any federal contract or approved subcontract, or to act as an agent or representative on behalf of another in such transactions."   (Exhibit D-1, 11/28/12 Suspension Notice at 2, 6; Exhibit E-1, 1/4/13 Suspension Notice at 1, 5).  As a result, BP has been barred from entering into leases with DOI for drilling rights, has been barred from entering into lease interest cross-assignments with innocent third party producers in the Gulf of Mexico, and has been barred from entering into fuel contracts with the Department of Defense, among other contracts and transactions.

73.     According to EPA, the suspension is based on the November 15, 2012 criminal Information filed against BPXP and "an immediate need to suspend" each of the BP Plaintiffs to protect the public interest.  (Exhibit D-1, 11/28/12 Suspension Notice ¶¶ 18-19, 25; Exhibit E-1, 1/4/13 Suspension Notice ¶¶ 17, 19, 25).   Yet EPA had known of the conduct and events underlying the Information for months and, in some instances, years.

74.     The Suspension Notice also recites that on November 14, 2012, the United States government issued indictments against (1) BPXP Well Site Leaders Robert Kaluza ("Kaluza") and  Donald  Vidrine  ("Vidrine"),  charging  them  with  Involuntary  Manslaughter,  Seaman's Manslaughter, and one count of violating the Clean Water Act, and (2) David Rainey ("Rainey"),

alleged to be a BP p.l.c. Vice President, charging him with one count each of Obstruction of Congress and making False Statements.  (Exhibit D-1, 11/28/12 Suspension Notice ¶¶ 14-15; Exhibit E-1, 1/4/13 Suspension Notice ¶¶ 15-16)  Yet EPA had known of the conduct and events underlying the Kaluza, Vidrine, and Rainey indictments — which are the same conduct and events at issue in the November 15, 2012 Information filed against BPXP — for months and, in some instances, years.

75.    EPA's Suspension Notice imputes BPXP's conduct to BP p.l.c., even though BP p.l.c. is not engaged in any contracting or other covered transactions with the federal government.  EPA further imputes the conduct of Kaluza, Vidrine, and Rainey to both BPXP and BP p.l.c., and EPA then contends that BP p.l.c.'s "affiliation" with the other BP Plaintiffs "provides the basis for the suspension" of those entities.  (Exhibit D-1, 11/28/12 Suspension Notice ¶¶ 20-24; Exhibit E-1, 1/4/13 Suspension Notice ¶¶ 21-22, 24).

76.    The day following the suspensions, representatives of BP, EPA, DOI, DLA, and the Coast Guard met in Washington, D.C.  BP learned for the first time at that meeting that, contrary to EPA's earlier representations that it would keep other agencies apprised of developments, EPA had not provided DOI or DLA with a copy of BP's Present Responsibility Submission prior to suspending BP.  Indeed, EPA had not even informed other interested agencies that BP had made a Present Responsibility Submission, thus preventing them from providing EPA with an informed view of BP's present responsibility and the immediate need, if any, for suspension.  Only after that meeting — when BP was already suspended — did EPA request that BP provide the Present Responsibility Submission to the other interested agencies.

77.    Several weeks later, BP learned that, before deciding to suspend BP, Defendant Pelletier had neither received nor considered the Justice Department's agreements under the Plea

Agreement to provide information relating to potential suspension and debarment.  Specifically,

on November 27, 2012, the day before the suspension was issued, the Department of Justice

wrote EPA requesting "that EPA today advise its Suspension and Debarment Division, as well as

the suspension and debarment personnel and officials of EPA and any other agency with relevant

debarment or suspension authority, of the following matters relating to the criminal resolution"

of BPXP's case:

- "By executing the guilty plea agreement and expressing the intent to enter guilty pleas pursuant to that agreement, BP has accepted criminal responsibility for its criminally charged conduct relating to the Deepwater Horizon blowout, explosion, oil spill, and response";

- The Plea Agreement did not limit the government's rights and authority "to take further civil or administrative action against BP including but not limited to any listing and debarment proceedings to restrict rights and opportunities of BP to contract with or receive assistance, loans, and benefits from United States government agencies";

- "BP is obligated pursuant to the guilty plea agreement to cooperate in any ongoing criminal investigation by the Department of Justice relating to the Deepwater Horizon blowout, explosion, oil spill, and response"; and

- "BP has agreed to be bound by numerous detailed safety requirements set forth" in the Plea Agreement's Remedial Order, "includ[ing],  among others, a process safety monitor, an ethics monitor, a safety auditor, and numerous other detailed safety requirements.  The Department included many of these provisions at the request of EPA's Suspension and Debarment Division, which indicated its preference for inclusion of those provisions in the criminal plea agreement rather than in an administrative agreement."

(Exhibit F, 11/27/12 Memo from L. Breuer to C. Giles at 1-2).

78.     Although EPA's suspension of BP was based on information issued by the Justice

Department, Defendant Pelletier did not receive or consider the Justice Department's memo to

EPA before suspending BP.  Instead, several weeks after the suspension was imposed, EPA's

SDD wrote Pelletier, noting that "at the time you made the decision to issue the Notice of

Suspension, the memo was not part of the administrative record." (Exhibit F, 12/19/12 Memo from F. Lane to R. Pelletier at 1).

**F.      The Suspension Of BP Is Unlawful, Arbitrary, Capricious, And An Abuse Of EPA's Discretion**

79.      Under federal law and regulations, suspension from participation in government contracting and transactions is a "serious action that EPA may take only to protect the public interest."  2 C.F.R. §§ 180.125(c), 180.700.  For this reason, EPA's authority to suspend is limited to situations where "immediate action is necessary to protect the public interest."  *Id.* § 180.700.

80.      A suspension must be only "for a temporary period pending the completion of an [agency's] investigation or resulting legal or debarment proceedings."  *Id.* §180.715(e); *see also id*. § 180.1015.  EPA may not suspend a company or person "for the purposes of punishment."  *Id.* § 180.125(c).

81.      In exercising its discretion to suspend, EPA must consider, and its decision must be based on, "all information contained in the official administrative record."  *Id.* § 180.750(a).

82.      Under the law, EPA may not suspend an entity on the grounds that it is an "affiliate" unless that entity is an "affiliate of a participant" in a "covered transaction" as defined by the federal regulations.  2 C.F.R. §§ 180.625(b), 180.980, 180.200.  A "participant" is limited to "any person who submits a proposal for or who enters into a covered transaction, including an agent or representative of a participant."  *Id*. § 180.980.  A "covered transaction" means "a nonprocurement or procurement transaction that is subject to the prohibitions of this part [2 C.F.R. Part 180]."  *Id*. § 180.200; *see also id*. § 180.970.

83.     EPA's suspension of BP fails to comply with federal law.  EPA did not suspend Plaintiffs to protect the public interest and there was and is no immediate need to suspend Plaintiffs to protect that interest.

84.     Since the *Deepwater Horizon* accident on April 20, 2010, the federal government has repeatedly contracted and transacted business with BP, after first determining that BP is a responsible contractor.  *See* 48 C.F.R. §§ 9.103, 9.104-1.   Indeed, the government continues to do business with BP today under its existing federal leases and contracts.

85.     Equally important, the conduct and events alleged by EPA to be the basis for the suspension had been known to EPA for months or even years and EPA was apprised of BPXP's Plea Agreement, so EPA learned nothing new from the resolution of BPXP's criminal case. Indeed, EPA concedes that the events leading to the suspension occurred over three years ago. Immediate action was not — and is not — necessary to protect the public interest.

86.     EPA's suspension of BP is not temporary, as required by federal law.  Despite the failure of the Suspension Notice to state expressly that the suspension was for a temporary period, that is what the law requires, and EPA has no authority to extend the suspension beyond the conclusion of the proceeding or investigation upon which the suspension was based.  The only "proceeding" against BP cited in the Suspension Notice as the basis for the suspension was the criminal proceeding against BPXP, which has concluded.  In addition, the record does not show that EPA is conducting any investigation of BP, nor did EPA initiate any debarment or other legal proceedings upon or subsequent to the date of the suspension.  Because authority for the suspension expired upon the termination of the "proceeding" that gave rise to the suspension, which was the criminal proceeding against BPXP, there is no legal basis for BP's suspension to continue.

87.    Because EPA had no legal basis to suspend Plaintiffs, the suspension is punishment.  EPA had long known of the events and conduct alleged to be the basis for suspension and, despite this, spent several months in the summer and fall of 2012 negotiating an Administrative Agreement with BP to resolve any and all potential suspension and debarment issues.  EPA also chose to suspend Plaintiffs even though EPA knew that nearly all of the suspended BP entities had no involvement in the *Deepwater Horizon* accident or its aftermath.

88.    As demonstrated by the Present Responsibility Submission, Plea Agreement, Remedial Order, and the Implementation Plan approved by the Department of Justice and Probation Officer, BP is a presently responsible contractor and thus there is no basis for the suspension to continue.  Despite a voluminous administrative record on the issue, EPA has not shown how or why BP is not a responsible contractor.  Indeed, EPA suspended numerous BP entity "affiliates" without addressing their present responsibility or explaining why immediate action was necessary for their suspension.

89.    EPA's suspension decision did not consider, and is not based upon, all of the information contained in the official administrative record, as required by the law.  Despite claiming that it considered the complete record, including each of the mitigating and aggravating factors under the federal regulations, EPA's decision does not mention, much less address, all of the evidence and mitigating factors presented by BP, and EPA selectively relies on a very few parts of the record while ignoring the remainder of the record.

90.    EPA's decision to suspend BP directly conflicts with the publicly expressed views of DOI's Bureau of Safety and Environmental Enforcement and Bureau of Ocean Energy Management — BPXP's principal regulators in matters pertaining to deepwater drilling.  In suspending BP, EPA failed to consult appropriately with, and to take into account the prior

findings and regulatory actions by, BSEE and BOEM, and failed to explain why it deviated from those findings and actions.

91.     EPA also failed to coordinate the suspension action with other interested agencies, such as DOI and DLA.   EPA represented to BP that it would keep other interested agencies apprised of this matter and has even claimed that it provided relevant information and documents to the other agencies.   But EPA did not do so and failed to provide these agencies with BP's Present Responsibility Submission, thus precluding those agencies from having an opportunity to provide their views on the necessity of the suspension to protect the public interest.

92.     EPA's suspension of BP Plaintiffs on the grounds that they are "affiliated" with Plaintiff BP p.l.c. is unlawful.   Under the law, an "affiliate" entity may only be included in a suspension where it is the affiliate of a participant in a covered transaction under the federal regulations.   BP p.l.c. is not a participant in a covered transaction and EPA has made no showing that it is.   Accordingly, BP Plaintiffs cannot be suspended based on their alleged affiliation with BP p.l.c.

**G.      EPA Disqualified BPXP Under The Clean Water Act**

93.     On February 1, 2013, following approval of BPXP's Plea Agreement, EPA issued a Disqualification Notice to BPXP under Clean Water Act § 1368.   (Exhibit G, 2/1/2013 Notice of Clean Water Act Listing).

94.     EPA's Disqualification Notice provides that, as a result of its one-count misdemeanor conviction for violating CWA § 1319(c), BPXP "cannot receive Federal contracts or benefits if any part of the work will be performed at the place where the [Clean Water Act] offense occurred (called the 'violating facility')."   (*Id.* at 1).

95.     EPA designated BPXP's corporate headquarters at 501 Westlake Park Boulevard, Houston, Texas, 77079-2604 as the "Location of [Clean Water Act] Violation" and thus the "Violating Facility."  (*Id.*)   As a result, according to EPA, BPXP cannot receive any "Federal contracts or benefits" if any aspect of those contracts and benefits is to be performed at BPXP's own headquarters.

**H.     The Disqualification Of BPXP's Headquarters Under The Clean Water Act Is Unlawful, Arbitrary, Capricious, And An Abuse Of EPA's Discretion**

96.     Section 1368 of the Clean Water Act provides that, "No Federal agency may enter into any contract with any person, who has been convicted of any offense under section 1319(c) of this title, for the procurement of goods, materials, and services if such contract is to be performed at any facility at which the violation which gave rise to such conviction occurred, and if such facility is owned, leased, or supervised by such person."  33 U.S.C. § 1368(a).

97.     Clean Water Act Section 1319(c) makes it unlawful to "negligently violate[]"§ 1321(b)(3) of that Act.  A violation of § 1321(b)(3), in turn, requires a "discharge of oil or hazardous substances," without a permit, "(i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act…, or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States … in such quantities as may be harmful …."  33 U.S.C. § 1321(b)(3).

98.     Under the plain terms of Clean Water Act § 1368(a), the "facility at which the violation which gave rise to such conviction [under § 1319(c)] occurred" is a facility at which the discharge of oil or hazardous substances in harmful quantities occurred, as required for any violation of §§ 1319(c) and 1321(b)(3).

99.     EPA administers Clean Water Act § 1368 through the agency's implementing regulations.  EPA defines a "violating facility" as:

> "any building, plant, installation, structure, mine, vessel, floating craft, location or site of operations that gives rise to a CAA [Clean Air Act] or CWA conviction and is a location at which or from which a Federal contract, subcontract, loan, assistance award or other covered transactions may be performed. If a site of operations giving rise to a CAA or CWA conviction contains or includes more than one building, plant, installation, structure, mine, vessel, floating craft, or other operational element, the entire location or site of operation is regarded as the violating facility unless otherwise limited by EPA.

2 C.F.R. § 1532.1600(b).  As required by § 1368(a), EPA's own regulations specify that the violating facility is the site of a Clean Water Act violation that gives rise to a conviction under the Act.  The "violating facility," according to EPA, is "the place where the [Clean Water Act] offense occurred…."  (Exhibit G, 2/1/2013 Notice of Clean Water Act Listing, at 1).

100.    There was no Clean Water Act violation at BPXP's corporate headquarters in Houston and BPXP has never been charged with or convicted of any such violation.  The Information filed against BPXP charged that "oil was discharged into the Gulf of Mexico" and "in connection with activities under the Outer Continental Shelf Lands Act and which affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States…."  (Information, Case No. 2:12-cr-00292-SSV-DEK, Rec. Doc. 1, ¶¶ 24, 73).

101.    BPXP's Plea Agreement, including the factual allocution, does not provide that a Clean Water Act violation occurred at BPXP's corporate headquarters.  On the contrary, the Plea Agreement allocution only recites violating conduct that occurred offshore on April 20, 2010. According to the allocution, BPXP "negligently discharged and caused to be discharged oil from the Macondo well" in the Gulf of Mexico, and "did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and

which may have affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such quantities as may be harmful in violation of Title 33, United States Code, Sections 1319(c)(l)(A) and 1321(b)(3)."  (11/15/2012 Guilty Plea Agreement, Case 2:12-cr-00292-SSV-DEK, Rec. Doc. 2-1, at 15-16).

102.    BPXP's Clean Water Act violation did not occur in Houston; it occurred more than 440 miles away in the Gulf of Mexico where the Macondo well blew out.

103.    EPA's designation of BPXP's corporate headquarters in Houston as the "violating facility" under the Clean Water Act violates the terms of that Act, EPA's regulations, policies, and statements, and is arbitrary, capricious, and an abuse of EPA's discretion.

104.    Independently, as demonstrated by the Plea Agreement, the Remedial Order, the Implementation Plan approved by the Department of Justice and BPXP's Probation Officer, and the Present Responsibility Submission, BPXP has corrected the condition giving rise to its Clean Water Act conviction, and thus there is no basis for BPXP's disqualification under that Act. EPA's continued disqualification of BPXP violates the terms of the Clean Water Act, EPA's regulations, policies, and statements, and is arbitrary, capricious, and an abuse of EPA's discretion.

105.    Finally, EPA's Disqualification Notice also purports to preclude BPXP from receiving any and all "Federal contracts and benefits" even though Clean Water Act § 1368(a) by its terms only prevents a convicted party from entering into a contract for the procurement of goods, materials, and services that would be performed at the facility at which the Clean Water Act violation occurred.  EPA's attempt to broaden the basis of disqualification under the Clean Water Act to include federal nonprocurement contracts, transactions, and benefits violates the terms of that Act and is arbitrary, capricious, and an abuse of EPA's discretion.

I.     **BP Filed An Administrative Contest to EPA's Suspension and Disqualification Decisions, Which EPA Denied**

106.    In February 2013, in accordance with federal regulations, BP contested EPA's suspension and disqualification decisions by making a written Presentation of Matters in Opposition ("PMIO") that explained why the suspension and disqualification were unlawful, arbitrary, capricious, punitive, and an abuse of discretion, and requested that both the suspension and disqualification be terminated and/or withdrawn so that BP could engage in federal contracting and transactions.  EPA's SDD submitted a response opposing BP's PMIO.

107.    After receiving final submissions from EPA's SDD and BP, Defendant Pelletier formally closed the administrative record on BP's administrative challenge on April 22, 2013. Defendant Pelletier's decision on BP's PMIO was then due by June 6, 2013.

108.    On June 5, 2013, the day before he was required by law to make a decision, Defendant Pelletier extended the time to issue his decision to June 28, 2013, claiming without explanation that there was "good cause" for the delay.

109.    On June 24, 2013, four days before he was required by law to issue a decision, Defendant Pelletier unilaterally re-opened the administrative record, thereby extending the time for a decision, purportedly to solicit additional information on the issue of the "violating facility" under the Clean Water Act.  Neither BP nor EPA's SDD had requested that the record be re-opened and BP objected on the grounds that Defendant Pelletier lacked the legal authority to do so and was unlawfully delaying a decision, to BP's prejudice.

110.    Defendant Pelletier issued a written decision on BP's administrative contest on July 19, 2013.  (Exhibit H, 7/19/2013 EPA Memorandum of Decision).  Among other things, Defendant Pelletier found that:

- "the events leading to the suspension [of BP] occurred over three years ago";

- BP has "accept[ed] criminal responsibility and agree[d] to cooperate in further investigations";

- "BPXP, BP plc, and BPCorpNA [BP Corporation North America Inc.] have agreed to 'numerous detailed safety requirements' the Court has ordered";

- "BPXP has been awarded new leases, and … the Director of BOEM considers 'BP' sincere and genuine about business and cultural reforms";

- The BP Plaintiffs "have taken responsibility for the wrongdoing and clearly recognize the seriousness of the criminal misconduct";

- "Thus far, BP has paid substantial amounts of money to make whole the damage inflicted" and "BP plc did provide billions of dollars to cover the damage caused by the DHB [Deepwater Horizon Blowout]";

- The BP Plaintiffs "have investigated the matter th[o]roughly and have taken some corrective action";

- "There is no evidence in the Record … that other senior executives encouraged or tolerated Mr. Rainey's alleged wrongdoing, or directed [BP] employees to circumvent safety and risk management procedures"; and

- "There is no evidence or suggestion that anyone associated with BP planned, initiated or deliberately carried out the DHB.  Likewise, there is no proffer that any of the BP entities has entered into a prior administrative agreement with a federal agency."  (*Id.* at 10-11, 16-18).

111.    Despite these findings and conclusions, Defendant Pelletier denied BP's administrative contest and continued the suspension and disqualification.  In so doing, Defendant Pelletier relied extensively on matters and events predating the *Deepwater Horizon* accident that he claims — for the very first time — to have considered prior to issuing the Suspension Notice, but which are nowhere mentioned in the Suspension Notice, the Revised and Supplemental Action Referral Memoranda on which the Suspension Notice was based, or even EPA SDD's response to BP's PMIO.  As a result, Defendant Pelletier's decision relies on matters and events that EPA had known about for years, that BP did not know EPA had considered in issuing the suspension, and to which BP could not respond in its PMIO.

112.    EPA's decision on BP's PMIO constitutes final agency action that is subject to review by this Court.  BP has exhausted its administrative remedies.

113.    BP is entitled to preliminary and permanent injunctive relief because (i) it has a substantial likelihood of success on the merits of its claims; (2) it faces a substantial threat of irreparable harm if an injunction is not granted; (3) the threatened injury to BP outweighs any harm that an injunction might cause to the Defendants; and (4) an injunction will not disserve the public interest.

## COUNT ONE

### (EPA's Suspension of BP Violates the Administrative Procedure Act)

114.    BP hereby incorporates by reference the allegations made in paragraphs 1 through 92 and 106 through 113, above, and realleges them as though fully set forth herein.

115.    EPA did not suspend BP to protect the public interest and there was and is no immediate need for suspension to protect that interest, as required by federal law.  *See* 2 C.F.R. §§ 180.125(c), 180.700.

116.    EPA's suspension of BP is not temporary and there is no pending agency investigation or legal or debarment proceedings that would permit the suspension to continue lawfully.  Specifically, the suspension was based on a criminal proceeding against BPXP, which was concluded on January 29, 2013, when judgment was entered.  Because EPA has made no findings of immediate need for a continued suspension after the conclusion of that proceeding, there is no authority for the continued suspension of any BP entities.  *See id.* §§ 180.605, 180.715(e), 180.760, 180.1015.

117.    EPA's suspension decision did not consider, and is not based upon, all information contained in the official administrative record.  *See id.* § 180.750(a).  In fact, EPA's decision to suspend is contrary to the record in this matter.

118.    EPA's suspension decision is not the product of reasoned decisionmaking, as required by the law.  *See id.* §§ 180.705(a).

119.    Following the *Deepwater Horizon* accident on April 20, 2010, and until EPA issued the November 28, 2012 Suspension Notice, the federal government had repeatedly contracted with BP after determining that it is a responsible contractor.  Indeed, the federal government continues to do business with BP today under its existing federal leases and contracts.  It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP from contracting with the federal government when BP continues to perform and do business with the government, and when the government has repeatedly determined that BP is a responsible contractor.

120.    The conduct and events alleged by EPA to be the basis for suspending BP had been known to EPA for months or even years.  It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP based on conduct and events long known to EPA, which EPA was aware of when it was negotiating an Administrative Agreement with BP, and which did not prevent the award of contracts and leases to BP prior to its suspension on November 28, 2012.

121.    Because EPA had no legal basis to suspend Plaintiffs, the suspension is punishment in violation of the law.  *See id.* § 180.125(c).

122.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP based on matters and events predating the *Deepwater Horizon*

accident that EPA claims to have considered prior to issuing the suspension, but which are nowhere mentioned in the Suspension Notice, the Revised and Supplemental Action Referral Memoranda on which the Suspension Notice was based, or EPA SDD's response to BP's PMIO. The EPA is not allowed under the law to base suspension on matters and events the EPA had known about for years, did not disclose to BP in issuing the suspension, and to which BP could not respond in its administrative challenge.

123.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP, and continue that suspension, when BP is presently responsible, as demonstrated by the Present Responsibility Submission, Plea Agreement, Remedial Order, and the Implementation Plan approved by the Department of Justice and BPXP's Probation Officer.

124.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend, and to continue the suspension of, numerous BP entity "affiliates" without addressing their present responsibility or explaining why immediate action was necessary for their suspension or to continue their suspension.

125.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to claim that it considered the complete record, including each of the mitigating and aggravating factors under the federal regulations, when EPA does not mention, much less address, all of the evidence and mitigating factors presented by BP, and when EPA selectively relies on a very few parts of the record while ignoring the remainder of the record.

126.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP when that decision conflicts with the views of BPXP's principal

federal regulators in matters pertaining to deepwater drilling, and EPA failed to explain that conflict in its decision.

127.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP when EPA failed to consult and/or coordinate the suspension action with other interested agencies, such as DOI and DLA, and to provide BP's Present Responsibility Submission to these and other interested agencies, so as to enable them to comment on BP's present responsibility.

128.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to suspend BP Plaintiffs on the grounds that they are "affiliated" with Plaintiff BP p.l.c., where BP p.l.c. is not a participant in a covered transaction.

129.    For these reasons, EPA's suspension of BP, and the continuation of that suspension, is contrary to law and regulation; exceeds EPA's statutory and regulatory authority and limitations; is unsupported by the record in this matter; is punitive, arbitrary, capricious, and an abuse of discretion; and otherwise not in accordance with law, all in violation of 5 U.S.C. § 706.

## COUNT II

**(EPA's Disqualification of BPXP Violates the Administrative Procedure Act)**

130.    BP hereby incorporates by reference the allegations made in paragraphs 1 through 69 and 93-113, above, and realleges them as though fully set forth herein.

131.    By its terms, the Clean Water Act only prevents the award of a contract "if such contract is to be performed at any facility at which the violation which gave rise to such conviction [under § 1319(c)] occurred…." 33 U.S.C. § 1368(a).

132.    BPXP's corporate headquarters in Houston is not a "facility at which the violation which gave rise to [BPXP's] conviction" under Clean Water Act § 1319(c) occurred.

133.    EPA's designation of BPXP's corporate headquarters in Houston as the "violating facility" under the Clean Water Act violates the terms of the Act and EPA's regulations, policies, and statements.

134.    Independently, the condition giving rise to BPXP's Clean Water Act conviction has been corrected, and thus there is no basis for BPXP's continued disqualification under that Act.

135.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to continue the disqualification when EPA has not explained how or or why the condition giving rise to BPXP's Clean Water Act conviction has not been corrected.

136.    It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for EPA to attempt to preclude BPXP from entering into federal nonprocurement contracts, transactions, and benefits when Clean Water Act § 1368(a) only prevents a convicted party from entering into a contract for the procurement of goods, materials, and services to be performed at the facility at which the Clean Water Act violation occurred.

137.    EPA's disqualification of BPXP under the Clean Water Act, the continuation of that disqualification, and the exclusion of BPXP from participation in new federal contracts and benefits exceeds EPA's statutory and regulatory authority and limitations; is unsupported by the record in this matter; is punitive, arbitrary, capricious, and an abuse of discretion; and is otherwise not in accordance with law, all in violation of 5 U.S.C. § 706.

## COUNT III

### (Declaratory Judgment Act)

138.    BP hereby incorporates by reference the allegations made in paragraphs 1 through 137 above, and realleges them as though fully set forth herein.

139.    The Declaratory Judgment Act, 28 U.S.C. § 2201, permits a district court to "declare the rights and other legal relations of any interested party" to a case or controversy over which the court has subject matter jurisdiction.

140.    As a result of suspending the BP Plaintiffs and disqualifying BPXP from participating in federal government contracting, transactions, and benefits, and refusing to terminate and/or withdraw the suspension and disqualification, a case or controversy exists between BP and EPA relating to the legality of EPA's actions.

141.    BP requests that the Court declare the rights and obligations of the Plaintiffs and Defendants in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

A.      Declare that EPA's suspension of BP, and the continuation of that suspension, is in excess of EPA's authority and limitations, punitive, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus rendering the suspension null, void, and unenforceable;

B.      Declare that EPA's failure to determine that BP is presently responsible is in excess of EPA's authority and limitations, punitive, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus rendering the suspension null, void, and unenforceable;

C.      Declare that EPA's designation of BPXP's corporate headquarters in Houston as the "violating facility" under the Clean Water Act is in excess of EPA's authority and limitations, punitive, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus rendering the disqualification null, void, and unenforceable;

D.      Declare that EPA's disqualification of BPXP, and the continuation of that disqualification, is in excess of EPA's authority and limitations, punitive, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus rendering the disqualification null, void, and unenforceable;

E.      Declare that EPA's failure to certify that the condition giving rise to BPXP's Clean Water Act conviction has been corrected is in excess of EPA's authority and limitations, punitive, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus rendering the disqualification null, void, and unenforceable;

F.      Declare that EPA's disqualification of BP from entering into any federal contracts or benefits, including federal nonprocurement contracts, transactions, and benefits, is in excess of EPA's authority and limitations, punitive, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, thus rendering the disqualification null, void, and unenforceable;

G.      Issue preliminary and permanent injunctive relief against enforcement of EPA's suspension and disqualification decisions;

H.      Award BP its reasonable attorney's fees and costs expended herein; and

I.      Grant such other and further relief as this Court deems just.

Dated:  August 12, 2013

OF COUNSEL:

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Brian P. Kavanaugh
David Spiegel
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
richard.godfrey@kirkland.com
andrew.langan@kirkland.com
andrew.bloomer@kirkland.com
brian.kavanaugh@kirkland.com
david.spiegel@kirkland.com

Robert S. Ryland
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005-5793
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200
robert.ryland@kirkland.com

Joel M. Gross
Allison B. Rumsey
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
joel.gross@aporter.com
allison.rumsey@aporter.com

Respectfully submitted,


s/Thomas W. Taylor
Thomas W. Taylor
Southern District Bar No. 3906
Texas Bar No. 19723875
ANDREWS KURTH LLP
600 Travis Street, Suite 4200
Houston, TX  77002
Telephone:  (713) 220-4200
Facsimile: (713) 220-4285
ttaylor@andrewskurth.com

ATTORNEY-IN-CHARGE PLAINTIFFS

Georgia L. Lucier
Southern District Bar No. 589122
Texas Bar No. 24043523
ANDREWS KURTH LLP
600 Travis Street, Suite 4200
Houston, TX  77002
Telephone:  (713)220-4177
Facsimile:  (713) 238-7349
glucier@andrewskurth.com